**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| STEPHEN HANNAWAY, derivatively on behalf of SPROUT SOCIAL, INC., | Case No.: |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JUSTYN HOWARD, RYAN BARRETTO, JOE DEL PRETO, AARON RANKIN, PETER BARRIS, STEVEN COLLINS, RAINA MOSKOWITZ, THOMAS STANLEY, and KAREN WALKER | |
| Defendants, | |
| and | |
| SPROUT SOCIAL, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiff Stephen Hannaway ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Sprout Social, Inc. ("Sprout Social" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Sprout Social with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Sprout Social; (iii) pleadings, papers, and any documents filed with and publicly available from securities class actions filed in this District against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between November 3, 2021 and May 2, 2024 (the "Relevant Period") with respect to Sprout Social's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Sprout Social.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Sprout Social's officers and members of the Company's Board. Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws during the Relevant Period that have caused and continue to cause substantial damages to Nominal Defendant Sprout Social.

2.      Sprout Social primarily derives its revenue from its service as a software ("SaaS") business model. The Company purports to provide an "all-in-one social media management platform" that enables its customers to extract real business value, strengthen market position, and

drive revenues. Sprout Social's "intuitive platform" offers its customers artificial intelligence ("AI") and automation to facilitate social media management, personalize customer care, drive sales, and amplify brand awareness.

3. Sprout Social initially targeted smaller month-to-month customers at the time of its initial public offering in 2019. The Company's customer base began to change after 2019, increasing to a 50-50 split of small month-to-month customers and larger enterprise customers with annual contracts by mid-2021.

4. Defendants (defined herein) touted the increasing amount of enterprise customers with annual contracts throughout the Relevant Period, attributing the growth to Sprout Social's "unique go-to-market strategy" and sales force execution with "a sales cycle that runs between 30 to 45 days on average."

5. On August 3, 2023, Sprout Social announced that it had acquired Tagger Media, Inc. ("Tagger"), a company with a purportedly "unified SaaS solutions enabl[ing] the world's largest brands and agencies to discover influencers, plan and manage campaigns, analyze competitor strategies, report on trends and measure [return on investment]—delivering tangible business impact." The $140 million acquisition, a price analysts viewed as "steep", purported "to establish Sprout Social as the leader in the social media software market with a comprehensive platform that empowers brands to execute a holistic social strategy at scale."

6. However, throughout the Relevant Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose *inter alia*, that: (i) the Company's sales and revenue growth were not indicative of the Company's growth as it transitioned to an enterprise sales cycle; (ii) the Company did not have the ability to sell to

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

enterprise customers, failing to execute its purported "unique go-to-market strategy" for those customers; (iii) as a result, the Company overpaid for Tagger and faced integration challenges with the acquisition; (iv) as a result, the Company was experiencing longer sales cycles and a slowing pipeline; (v) consequently, the Company would revise fiscal year 2024 revenue guidance; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

7.      On August 3, 2023, the same day the Tagger acquisition was announced, Sprout Social lowered its full-year revenue and non-GAAP operating income guidance. Defendants also admitted that the Tagger acquisition was a result of the Company's lack of ability to provide influencer marketing which was "a customer requirement showing up in more than half of our enterprise conversations."

8.      On this news, Sprout Social's stock price dropped $6.57 per share, or 12.3%, from a closing price of $53.38 per share on August 3, 2023, to close at $46.81 per share on August 4, 2023, on unusually heavy trading volume.

9.      Defendants continued making false and misleading statements after the August 3, 2023 disclosures, stating, for example, on November 2, 2023, that "we generally have a faster sales cycle than you might see with other enterprise software players" and claiming that the Tagger "[b]usiness integration has [] progressed smoothly."

10.      On May 2, 2024, the Company issued a press release announcing its first quarter 2024 financial results (the "May 2024 Press Release"). The May 2024 Press Release revealed that the Company had missed its revenue guidance for the quarter and that it was issuing a $20 million downward revision to revenue guidance for the Company's full-year 2024, noting that the Company faced "self-inducing sales execution headwinds." On the earnings call that same day,

Defendants disclosed that the Company was "definitely seeing lengthening of [its] sales cycles, as the composition of the customer base and prospect base is changing."

11.     On this news, Sprout Social's stock price plunged by over 40%, from a closing price of $48.15 per share on May 2, 2024, to close at $28.82 on May 3, 2024, on unusually heavy trading volume.

12.     As a direct and proximate result of the misconduct described herein by Individual Defendants, Sprout Social has sustained significant damages as explained below.

### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b), 15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Section 14 of the Exchange Act (15 U.S.C. § 78n(a)(1)) and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240-.14a-9).  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Sprout Social. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Sprout Social could have sued the same defendants in this District.

<u>**PARTIES**</u>

16.     Plaintiff is a Sprout Social stockholder and has continuously held Sprout Social stock from the time of the wrongdoing alleged herein until the present. Plaintiff will fairly and adequately represent Sprout Social's interest in this action.

17.     Nominal Defendant Sprout Social is incorporated under the laws of Delaware, and its principal executive offices are located at 131 South Dearborn Street, Suite 700, Chicago, Illinois, 60603. Sprout Social's common stock trades on the Nasdaq exchange under the symbol "SPT."

18.     Defendant Justyn Howard ("Howard") co-founded Sprout Social. He has served as Sprout Social's Chief Executive Officer ("CEO") and Chair of the Board since April 2010. On April 15, 2024, the Company announced that effective October 1, 2024, defendant Howard would transition to Executive Chair. For the Company's fiscal year 2023, defendant Howard received a base pay salary of $480,000, over $6.6 million in stock awards, and $513,600 in non-equity incentive plan compensation for a total of over $7.6 million. For the Company's fiscal year 2022, defendant Howard received a base pay salary of $460,000, almost $5.2 million in stock awards, and $432,400 in non-equity incentive plan compensation for a total of nearly $6.1 million. For the Company's fiscal year 2021, defendant Howard received a base pay salary of $428,000, almost $4.5 million in stock awards, $505,040 in non-equity incentive plan compensation, and $181,422 in other compensation for a total of over $5.6 million. During the Relevant Period, defendant Howard sold 770,658 shares of Company stock for proceeds of over $46.7 million as shown in the chart below:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/8/2021 | 1,300 | $127.22 | $165,386.00 |
| 11/8/2021 | 500 | $128.68 | $64,340.00 |
| 11/8/2021 | 2,100 | $129.69 | $272,349.00 |
| 11/8/2021 | 6,565 | $130.84 | $858,964.60 |
| 11/8/2021 | 7,094 | $131.72 | $934,421.68 |
| 11/8/2021 | 2,441 | $132.43 | $323,261.63 |
| 12/8/2021 | 1,300 | $101.97 | $132,561.00 |
| 12/8/2021 | 2,571 | $102.84 | $264,401.64 |
| 12/8/2021 | 1,323 | $103.81 | $137,340.63 |
| 12/8/2021 | 1,438 | $104.91 | $150,860.58 |
| 12/8/2021 | 7,573 | $106.39 | $805,691.47 |
| 12/8/2021 | 5,795 | $106.85 | $619,195.75 |
| 1/10/2022 | 3,383 | $70.58 | $238,772.14 |
| 1/10/2022 | 5,948 | $71.69 | $426,412.12 |
| 1/10/2022 | 2,657 | $72.58 | $192,845.06 |
| 1/10/2022 | 3,323 | $73.87 | $245,470.01 |
| 1/10/2022 | 4,686 | $74.89 | $350,934.54 |
| 1/10/2022 | 3 | $75.41 | $226.23 |
| 2/8/2022 | 2,198 | $69.40 | $152,541.20 |
| 2/8/2022 | 4,999 | $70.39 | $351,879.61 |
| 2/8/2022 | 11,743 | $71.34 | $837,745.62 |
| 2/8/2022 | 1,060 | $71.91 | $76,224.60 |
| 3/2/2022 | 13,865 | $67.77 | $939,631.05 |
| 3/8/2022 | 3,330 | $54.52 | $181,551.60 |
| 3/8/2022 | 4,259 | $55.50 | $236,374.50 |
| 3/8/2022 | 1,400 | $56.51 | $79,114.00 |
| 3/8/2022 | 3,536 | $58.37 | $206,396.32 |
| 3/8/2022 | 6,775 | $58.97 | $399,521.75 |
| 3/8/2022 | 700 | $59.74 | $41,818.00 |
| 4/8/2022 | 10,966 | $72.44 | $794,377.04 |
| 4/8/2022 | 6,090 | $73.31 | $446,457.90 |
| 4/8/2022 | 2,944 | $74.20 | $218,444.80 |
| 5/10/2022 | 7,075 | $45.93 | $324,954.75 |
| 5/10/2022 | 7,147 | $47.16 | $337,052.52 |
| 5/10/2022 | 3,650 | $47.94 | $174,981.00 |
| 5/10/2022 | 923 | $49.33 | $45,531.59 |
| 5/10/2022 | 1,205 | $50.20 | $60,491.00 |
| 6/2/2022 | 5,297 | $51.68 | $273,748.96 |
| 6/8/2022 | 5,381 | $56.15 | $302,143.15 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 6/8/2022 | 5,833 | $56.85 | $331,606.05 |
| 6/8/2022 | 7,764 | $57.94 | $449,846.16 |
| 6/8/2022 | 1,022 | $59.06 | $60,359.32 |
| 7/7/2022 | 700 | $62.69 | $43,883.00 |
| 7/7/2022 | 4,602 | $63.80 | $293,607.60 |
| 7/7/2022 | 14,698 | $64.69 | $950,813.62 |
| 8/8/2022 | 600 | $61.76 | $37,056.00 |
| 8/8/2022 | 900 | $62.99 | $56,691.00 |
| 8/8/2022 | 9,165 | $64.31 | $589,401.15 |
| 8/8/2022 | 8,835 | $65.18 | $575,865.30 |
| 8/8/2022 | 500 | $65.80 | $32,900.00 |
| 9/1/2022 | 5,957 | $57.53 | $342,706.21 |
| 9/8/2022 | 1,000 | $58.17 | $58,170.00 |
| 9/8/2022 | 3,200 | $58.98 | $188,736.00 |
| 9/8/2022 | 7,568 | $59.71 | $451,885.28 |
| 9/8/2022 | 8,032 | $60.78 | $488,184.96 |
| 9/8/2022 | 200 | $61.33 | $12,266.00 |
| 10/7/2022 | 10,093 | $61.54 | $621,123.22 |
| 10/7/2022 | 2,462 | $62.37 | $153,554.94 |
| 10/7/2022 | 1,363 | $63.43 | $86,455.09 |
| 10/7/2022 | 4,382 | $64.29 | $281,718.78 |
| 10/7/2022 | 700 | $65.14 | $45,598.00 |
| 10/7/2022 | 1,000 | $66.40 | $66,400.00 |
| 11/8/2022 | 4,508 | $49.97 | $225,264.76 |
| 11/8/2022 | 4,713 | $51.04 | $240,551.52 |
| 11/8/2022 | 6,506 | $52.06 | $338,702.36 |
| 11/8/2022 | 3,673 | $53.14 | $195,183.22 |
| 11/8/2022 | 600 | $53.60 | $32,160.00 |
| 12/1/2022 | 5,929 | $59.60 | $353,368.40 |
| 12/8/2022 | 900 | $56.37 | $50,733.00 |
| 12/8/2022 | 767 | $57.17 | $43,849.39 |
| 12/8/2022 | 3,256 | $58.73 | $191,224.88 |
| 12/8/2022 | 13,693 | $59.24 | $811,173.32 |
| 12/8/2022 | 1,284 | $60.21 | $77,309.64 |
| 12/8/2022 | 100 | $61.03 | $6,103.00 |
| 1/9/2023 | 2,686 | $51.97 | $139,591.42 |
| 1/9/2023 | 13,662 | $52.69 | $719,850.78 |
| 1/9/2023 | 3,652 | $53.60 | $195,747.20 |
| 2/8/2023 | 14,090 | $62.20 | $876,398.00 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/8/2023 | 2,501 | $62.93 | $157,387.93 |
| 2/8/2023 | 3,394 | $64.08 | $217,487.52 |
| 2/8/2023 | 15 | $64.94 | $974.10 |
| 3/2/2023 | 17,301 | $63.51 | $1,098,786.51 |
| 3/8/2023 | 12,205 | $63.64 | $776,726.20 |
| 3/8/2023 | 6,095 | $64.52 | $393,249.40 |
| 3/8/2023 | 1,700 | $65.24 | $110,908.00 |
| 4/10/2023 | 3,335 | $50.46 | $168,284.10 |
| 4/10/2023 | 16,565 | $51.19 | $847,962.35 |
| 4/10/2023 | 100 | $51.82 | $5,182.00 |
| 5/8/2023 | 11,707 | $39.93 | $467,460.51 |
| 5/8/2023 | 8,293 | $40.43 | $335,285.99 |
| 6/2/2023 | 6,264 | $43.14 | $270,228.96 |
| 6/8/2023 | 13,391 | $47.38 | $634,465.58 |
| 8/8/2023 | 6,609 | $48.00 | $317,232.00 |
| 9/1/2023 | 8,981 | $52.81 | $474,286.61 |
| 9/6/2023 | 70,699 | $51.85 | $3,665,743.15 |
| 9/6/2023 | 4,301 | $52.68 | $226,576.68 |
| 11/8/2023 | 9,357 | $49.59 | $464,004.27 |
| 11/8/2023 | 10,100 | $50.28 | $507,838.10 |
| 11/8/2023 | 543 | $50.94 | $27,662.59 |
| 11/9/2023 | 20,000 | $47.48 | $949,660.00 |
| 12/1/2023 | 8,981 | $59.78 | $536,884.18 |
| 12/6/2023 | 8,838 | $56.32 | $497,791.51 |
| 12/6/2023 | 11,162 | $57.17 | $638,075.73 |
| 12/7/2023 | 8,317 | $54.84 | $456,087.65 |
| 12/7/2023 | 11,683 | $55.61 | $649,633.22 |
| 1/8/2024 | 1,200 | $56.30 | $67,563.60 |
| 1/8/2024 | 7,104 | $57.82 | $410,753.28 |
| 1/8/2024 | 11,696 | $58.29 | $681,806.62 |
| 2/6/2024 | 3,076 | $58.23 | $179,100.10 |
| 2/6/2024 | 15,410 | $59.49 | $916,710.08 |
| 2/6/2024 | 1,514 | $60.05 | $90,909.64 |
| 3/1/2024 | 23,083 | $63.95 | $1,476,157.85 |
| 3/6/2024 | 7,000 | $58.88 | $412,153.00 |
| 3/6/2024 | 13,000 | $59.40 | $772,135.00 |
| 3/7/2024 | 33,661 | $58.24 | $1,960,282.00 |
| 3/7/2024 | 6,339 | $59.04 | $374,248.22 |
| 4/8/2024 | 7,500 | $55.85 | $418,875.00 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/8/2024 | 9,148 | $56.79 | $519,514.92 |
| 4/8/2024 | 3,352 | $57.26 | $191,935.52 |
| **Total** | **770,658** | | **$46,748,463.28** |

19.     Defendant Ryan Barretto ("Barretto") has served the Company's President since December 2020.  Prior to this role, he served as Sprout Social's Senior Vice President of Global Sales from July 2016 to December 2020.  On October 1, 2024, Barretto will replace defendant Howard as the Company's CEO.  For the Company's fiscal year 2023, defendant Barretto received a base pay salary of $425,000, almost $3.5 million in stock awards, $454,751 in non-equity incentive plan compensation, and $6,250 in all other compensation for a total of nearly $4.4 million.  For the Company's fiscal year 2022, defendant Barretto received a base pay salary of $400,000, almost $3.2 million in stock awards, $376,000 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of nearly $4 million.  For the Company's fiscal year 2021, defendant Barretto received a base pay salary of $375,000, almost $18 million in stock awards, $442,501 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of over $18.8 million.  During the Relevant Period, defendant Barretto sold 579,441 shares of Company stock for proceeds of almost $17.5 million as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/1/2021 | 788 | $94.77 | $74,678.76 |
| 12/1/2021 | 720 | $96.15 | $69,228.00 |
| 12/1/2021 | 896 | $98.03 | $87,834.88 |
| 12/1/2021 | 200 | $98.85 | $19,770.00 |
| 12/1/2021 | 605 | $100.62 | $60,875.10 |
| 12/1/2021 | 450 | $101.69 | $45,760.50 |
| 12/1/2021 | 700 | $103.11 | $72,177.00 |
| 12/1/2021 | 100 | $103.84 | $10,384.00 |

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/1/2021 | 200 | $105.44 | $21,088.00 |
| 12/1/2021 | 200 | $106.56 | $21,312.00 |
| 12/1/2021 | 400 | $108.28 | $43,312.00 |
| 12/1/2021 | 300 | $110.44 | $33,132.00 |
| 12/1/2021 | 41 | $111.64 | $4,577.24 |
| 12/2/2021 | 13,236 | $99.66 | $1,319,099.76 |
| 1/3/2022 | 5,600 | $0.00 | $0.00 |
| 1/3/2022 | 100 | $89.22 | $8,922.00 |
| 1/3/2022 | 1,000 | $84.53 | $84,530.00 |
| 1/3/2022 | 1,700 | $85.74 | $145,758.00 |
| 1/3/2022 | 1,990 | $86.65 | $172,425.54 |
| 1/3/2022 | 810 | $87.47 | $70,850.70 |
| 1/10/2022 | 271,748 | $0.00 | $0.00 |
| 2/3/2022 | 1,660 | $61.89 | $102,737.40 |
| 2/3/2022 | 2,691 | $62.28 | $167,595.48 |
| 2/3/2022 | 500 | $63.65 | $31,825.00 |
| 2/3/2022 | 449 | $64.42 | $28,924.58 |
| 2/3/2022 | 300 | $65.50 | $19,650.00 |
| 3/3/2022 | 3,682 | $63.65 | $234,359.30 |
| 3/3/2022 | 1,018 | $64.53 | $65,691.54 |
| 3/3/2022 | 700 | $65.70 | $45,990.00 |
| 3/3/2022 | 200 | $66.77 | $13,354.00 |
| 3/7/2022 | 17,627 | $0.00 | $0.00 |
| 4/4/2022 | 4,707 | $83.14 | $391,339.98 |
| 4/4/2022 | 500 | $84.13 | $42,065.00 |
| 4/4/2022 | 393 | $85.53 | $33,613.29 |
| 5/3/2022 | 2,242 | $62.90 | $141,021.80 |
| 5/3/2022 | 1,884 | $63.74 | $120,086.16 |
| 5/3/2022 | 1,474 | $64.68 | $95,338.32 |
| 6/2/2022 | 5,718 | $58.31 | $333,416.58 |
| 6/3/2022 | 3,092 | $54.39 | $168,173.88 |
| 6/3/2022 | 906 | $54.99 | $49,820.94 |
| 6/3/2022 | 602 | $56.64 | $34,097.28 |
| 6/3/2022 | 700 | $57.37 | $40,159.00 |
| 6/3/2022 | 300 | $58.27 | $17,481.00 |
| 7/5/2022 | 300 | $56.35 | $16,905.00 |
| 7/5/2022 | 500 | $58.13 | $29,065.00 |
| 7/5/2022 | 100 | $58.81 | $5,881.00 |
| 7/5/2022 | 1,100 | $60.32 | $66,352.00 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/5/2022 | 2,221 | $61.47 | $136,524.87 |
| 7/5/2022 | 1,300 | $62.57 | $81,341.00 |
| 7/5/2022 | 79 | $63.04 | $4,980.16 |
| 8/3/2022 | 1,300 | $53.66 | $69,758.00 |
| 8/3/2022 | 545 | $54.64 | $29,778.80 |
| 8/3/2022 | 1,200 | $55.74 | $66,888.00 |
| 8/3/2022 | 800 | $56.65 | $45,320.00 |
| 8/3/2022 | 800 | $57.89 | $46,312.00 |
| 8/3/2022 | 855 | $58.96 | $50,410.80 |
| 8/3/2022 | 100 | $59.43 | $5,943.00 |
| 9/2/2022 | 17,219 | $57.66 | $992,847.54 |
| 9/2/2022 | 768 | $55.15 | $42,355.20 |
| 9/2/2022 | 2,313 | $56.10 | $129,759.30 |
| 9/2/2022 | 2,519 | $56.19 | $141,542.61 |
| 10/3/2022 | 1,800 | $61.16 | $110,088.00 |
| 10/3/2022 | 1,700 | $62.03 | $105,451.00 |
| 10/3/2022 | 1,700 | $63.42 | $107,814.00 |
| 10/3/2022 | 400 | $63.92 | $25,568.00 |
| 11/4/2022 | 5,600 | $50.18 | $281,008.00 |
| 12/2/2022 | 9,723 | $58.81 | $571,809.63 |
| 12/5/2022 | 2,197 | $59.67 | $131,094.99 |
| 12/5/2022 | 2,102 | $60.94 | $128,095.88 |
| 12/5/2022 | 1,301 | $61.82 | $80,427.82 |
| 1/3/2023 | 1,200 | $55.58 | $66,696.00 |
| 1/3/2023 | 2,326 | $56.65 | $131,767.90 |
| 1/3/2023 | 1,874 | $57.50 | $107,755.00 |
| 1/3/2023 | 200 | $58.39 | $11,678.00 |
| 2/3/2023 | 1,000 | $64.35 | $64,350.00 |
| 2/3/2023 | 1,000 | $65.61 | $65,610.00 |
| 2/3/2023 | 500 | $66.59 | $33,295.00 |
| 2/3/2023 | 600 | $67.78 | $40,668.00 |
| 2/3/2023 | 1,500 | $69.34 | $104,010.00 |
| 2/3/2023 | 1,000 | $70.21 | $70,210.00 |
| 3/2/2023 | 14,859 | $61.39 | $912,194.01 |
| 3/3/2023 | 600 | $64.02 | $38,412.00 |
| 3/3/2023 | 2,100 | $65.01 | $136,521.00 |
| 3/3/2023 | 2,900 | $66.04 | $191,516.00 |
| 4/3/2023 | 2,575 | $57.26 | $147,444.50 |
| 4/3/2023 | 1,900 | $58.28 | $110,732.00 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/3/2023 | 1,125 | $59.07 | $66,453.75 |
| 6/5/2023 | 10,139 | $43.89 | $445,000.71 |
| 7/5/2023 | 6,656 | $45.55 | $303,180.80 |
| 7/5/2023 | 4,544 | $46.43 | $210,977.92 |
| 8/3/2023 | 1,500 | $53.50 | $80,250.00 |
| 8/3/2023 | 9,700 | $53.08 | $514,876.00 |
| 9/5/2023 | 11,110 | $52.62 | $584,608.20 |
| 9/5/2023 | 5,600 | $52.66 | $294,896.00 |
| 11/3/2023 | 11,200 | $50.09 | $560,996.80 |
| 12/4/2023 | 11,307 | $58.53 | $661,843.94 |
| 12/4/2023 | 2,986 | $58.16 | $173,677.70 |
| 12/4/2023 | 2,214 | $58.83 | $130,247.41 |
| 12/4/2023 | 400 | $59.79 | $23,917.20 |
| 1/4/2024 | 4,500 | $55.98 | $251,928.00 |
| 1/4/2024 | 1,100 | $56.49 | $62,141.20 |
| 2/5/2024 | 4,324 | $59.47 | $257,152.60 |
| 2/5/2024 | 1,276 | $60.19 | $76,801.16 |
| 3/4/2024 | 28,755 | $64.02 | $1,840,981.37 |
| 3/4/2024 | 2,395 | $63.64 | $152,427.38 |
| 3/4/2024 | 3,205 | $64.12 | $205,507.81 |
| 4/4/2024 | 2,600 | $56.24 | $146,224.00 |
| 4/4/2024 | 2,500 | $57.50 | $143,742.50 |
| 4/4/2024 | 500 | $57.94 | $28,970.00 |
| **Total** | **579,441** | | **$17,495,439.47** |

20.     Defendant Joe Del Preto ("Del Preto") has been the Company's Chief Financial Officer ("CFO") and Treasurer since July 2017. For the Company's fiscal year 2023, defendant Del Preto received a base pay salary of $437,500, over $2.3 million in stock awards, $280,875 in non-equity incentive plan compensation, and $5,787 in all other compensation for a total of almost $3.1 million. For the Company's fiscal year 2022, defendant Del Preto received a base pay salary of $390,000, over $1.8 million in stock awards, $219,960 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of almost $2.5 million. For the Company's fiscal year 2021, defendant Del Preto received a base pay salary of $355,000, over

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

$1.1 million in stock awards, $251,341 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of over $1.7 million.  During the Relevant Period, defendant Del Preto sold 68,759 shares of Company stock for proceeds of over $4.1 million as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/2/2021 | 1,315 | $99.66 | $131,052.90 |
| 12/16/2021 | 600 | $92.20 | $55,320.60 |
| 12/16/2021 | 600 | $93.01 | $55,803.00 |
| 12/16/2021 | 400 | $94.06 | $37,625.20 |
| 12/16/2021 | 200 | $95.17 | $19,033.00 |
| 1/4/2022 | 560 | $76.85 | $43,036.00 |
| 1/18/2022 | 900 | $65.24 | $58,716.00 |
| 2/2/2022 | 457 | $68.65 | $31,373.05 |
| 2/17/2022 | 900 | $66.86 | $60,174.00 |
| 3/2/2022 | 2,890 | $66.74 | $192,878.60 |
| 3/22/2022 | 900 | $75.52 | $67,968.00 |
| 4/4/2022 | 439 | $83.07 | $36,467.73 |
| 4/19/2022 | 900 | $70.49 | $63,441.00 |
| 5/3/2022 | 445 | $63.31 | $28,172.95 |
| 5/10/2022 | 900 | $47.64 | $42,876.00 |
| 6/2/2022 | 1,555 | $58.31 | $90,672.05 |
| 6/15/2022 | 900 | $48.04 | $43,236.00 |
| 7/5/2022 | 427 | $60.55 | $25,854.85 |
| 8/2/2022 | 441 | $51.70 | $22,799.70 |
| 9/2/2022 | 1,686 | $57.66 | $97,214.76 |
| 9/6/2022 | 1,500 | $56.39 | $84,585.00 |
| 10/4/2024 | 441 | $67.11 | $29,595.51 |
| 10/6/2022 | 1,500 | $67.50 | $101,250.00 |
| 11/1/2022 | 465 | $59.92 | $27,862.80 |
| 11/7/2022 | 1,500 | $48.73 | $73,095.00 |
| 12/2/2022 | 1,812 | $58.81 | $106,567.34 |
| 12/6/2022 | 1,500 | $59.61 | $89,415.00 |
| 1/5/2023 | 505 | $56.48 | $28,522.40 |
| 1/6/2023 | 1,500 | $53.59 | $80,385.00 |
| 2/2/2023 | 443 | $69.82 | $30,929.37 |
| 2/6/2023 | 1,500 | $62.96 | $94,440.00 |
| 3/2/2023 | 5,178 | $61.39 | $317,867.06 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/6/2023 | 1,500 | $66.37 | $99,555.00 |
| 4/4/2023 | 409 | $58.25 | $23,825.48 |
| 4/6/2023 | 1,500 | $53.51 | $80,265.00 |
| 5/2/2023 | 315 | $48.65 | $15,324.44 |
| 5/8/2023 | 1,500 | $39.81 | $59,715.00 |
| 6/5/2023 | 2,497 | $43.89 | $109,590.83 |
| 6/6/2023 | 1,500 | $43.52 | $65,280.00 |
| 6/30/2023 | 424 | $47.12 | $19,977.18 |
| 7/6/2023 | 1,500 | $46.55 | $69,825.00 |
| 8/2/2023 | 492 | $53.66 | $26,399.24 |
| 8/7/2023 | 1,500 | $46.62 | $69,930.00 |
| 9/5/2023 | 2,776 | $52.62 | $146,084.22 |
| 10/3/2023 | 479 | $48.15 | $23,063.85 |
| 11/2/2023 | 462 | $43.34 | $20,022.16 |
| 12/4/2023 | 2,346 | $58.53 | $137,320.76 |
| 12/4/2023 | 1,500 | $58.83 | $88,245.00 |
| 1/2/2024 | 1,500 | $62.11 | $93,165.00 |
| 2/5/2024 | 1,200 | $59.52 | $71,428.80 |
| 2/5/2024 | 300 | $60.46 | $18,138.90 |
| 3/4/2024 | 6,800 | $64.02 | $435,356.40 |
| 3/4/2024 | 1,300 | $63.89 | $83,057.00 |
| 3/4/2024 | 200 | $64.25 | $12,849.00 |
| 4/1/2024 | 1,500 | $59.63 | $89,445.00 |
| **Total** | **68,759** | | **$4,126,093.15** |

21.     Defendant Aaron Rankin ("Rankin") co-founded Sprout Social and has served as a member of the Board since April 2010. From April 2010 to December 2023, Rankin served as the Company's Chief Technology Officer ("CTO"). For the Company's fiscal year 2023, defendant Rankin received a base pay salary of $340,000, $944,137 in stock awards, $181,900 in non-equity incentive plan compensation, and $6,250 in all other compensation for a total of almost $1.5 million. For the Company's fiscal year 2022, defendant Rankin received a base pay salary of $330,000, $864,860 in stock awards, $155,101 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of over $1.3 million. For the Company's fiscal year

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

2021, defendant Rankin received a base pay salary of $310,000, $749,992 in stock awards, $182,901 in non-equity incentive plan compensation, and $4,500 in all other compensation for a total of over $1.2 million. During the Relevant Period, defendant Rankin sold 696,210 shares of Company stock for proceeds of over $44.1 million as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/22/2021 | 1,785 | $109.58 | $195,605.66 |
| 11/22/2021 | 400 | $111.24 | $44,497.20 |
| 11/22/2021 | 2,203 | $113.39 | $249,791.56 |
| 11/22/2021 | 400 | $114.35 | $45,738.00 |
| 11/22/2021 | 800 | $115.41 | $92,326.40 |
| 11/22/2021 | 400 | $116.24 | $46,494.00 |
| 11/22/2021 | 400 | $118.07 | $47,226.00 |
| 11/22/2021 | 212 | $119.25 | $25,281.64 |
| 11/22/2021 | 500 | $121.16 | $60,579.00 |
| 11/22/2021 | 700 | $122.21 | $85,546.30 |
| 11/22/2021 | 300 | $123.20 | $36,960.00 |
| 11/22/2021 | 300 | $125.59 | $37,677.90 |
| 11/22/2021 | 100 | $127.86 | $12,786.00 |
| 11/22/2021 | 5,031 | $109.59 | $551,322.14 |
| 11/22/2021 | 1,000 | $111.22 | $111,224.00 |
| 11/22/2021 | 300 | $112.20 | $33,659.10 |
| 11/22/2021 | 5,143 | $113.33 | $582,856.19 |
| 11/22/2021 | 1,813 | $114.16 | $206,979.33 |
| 11/22/2021 | 1,774 | $115.32 | $204,574.13 |
| 11/22/2021 | 1,100 | $116.19 | $127,806.80 |
| 11/22/2021 | 1,500 | $117.62 | $176,428.50 |
| 11/22/2021 | 301 | $118.57 | $35,689.87 |
| 11/22/2021 | 520 | $119.60 | $62,190.96 |
| 11/22/2021 | 660 | $121.09 | $79,920.72 |
| 11/22/2021 | 2,129 | $122.18 | $260,112.70 |
| 11/22/2021 | 1,029 | $122.82 | $126,385.90 |
| 11/22/2021 | 900 | $125.59 | $113,032.80 |
| 11/22/2021 | 300 | $127.86 | $38,358.00 |
| 12/13/2021 | 583 | $94.50 | $55,093.50 |
| 12/20/2021 | 400 | $83.98 | $33,591.20 |
| 12/20/2021 | 599 | $85.02 | $50,925.18 |
| 12/20/2021 | 1,909 | $86.20 | $164,546.26 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 12/20/2021 | 2,236 | $87.12 | $194,809.26 |
| 12/20/2021 | 3,256 | $88.00 | $286,531.26 |
| 12/20/2021 | 100 | $89.23 | $8,923.00 |
| 12/20/2021 | 1,700 | $84.31 | $143,328.70 |
| 12/20/2021 | 1,700 | $85.38 | $145,146.00 |
| 12/20/2021 | 6,300 | $86.44 | $544,559.40 |
| 12/20/2021 | 7,169 | $87.52 | $627,438.05 |
| 12/20/2021 | 6,231 | $88.14 | $549,219.03 |
| 12/20/2021 | 400 | $89.32 | $35,726.00 |
| 12/21/2021 | 5,400 | $90.00 | $486,000.00 |
| 12/21/2021 | 4,928 | $90.38 | $445,402.50 |
| 12/21/2021 | 4,100 | $91.58 | $375,478.00 |
| 12/21/2021 | 4,434 | $92.51 | $410,171.60 |
| 12/21/2021 | 1,138 | $93.50 | $106,406.41 |
| 1/20/2022 | 4,317 | $61.15 | $263,975.92 |
| 1/20/2022 | 1,744 | $62.29 | $108,640.74 |
| 1/20/2022 | 4,090 | $63.82 | $261,015.62 |
| 1/20/2022 | 5,544 | $64.70 | $358,702.34 |
| 1/20/2022 | 5,890 | $65.63 | $386,537.14 |
| 1/20/2022 | 1,915 | $66.79 | $127,893.28 |
| 1/20/2022 | 1,555 | $61.12 | $95,035.38 |
| 1/20/2022 | 693 | $62.40 | $43,245.97 |
| 1/20/2022 | 1,926 | $63.96 | $123,188.89 |
| 1/20/2022 | 2,419 | $65.04 | $157,329.34 |
| 1/20/2022 | 1,407 | $65.99 | $92,850.74 |
| 1/20/2022 | 500 | $66.95 | $33,474.00 |
| 2/18/2022 | 6,715 | $52.82 | $354,659.44 |
| 2/18/2022 | 7,099 | $53.81 | $381,982.99 |
| 2/18/2022 | 3,800 | $54.74 | $208,000.60 |
| 2/18/2022 | 1,608 | $55.80 | $89,729.62 |
| 2/18/2022 | 2,486 | $57.12 | $142,010.26 |
| 2/18/2022 | 1,492 | $57.82 | $86,264.46 |
| 2/18/2022 | 300 | $59.01 | $17,703.90 |
| 2/18/2022 | 2,449 | $52.82 | $129,356.18 |
| 2/18/2022 | 2,650 | $53.84 | $142,673.35 |
| 2/18/2022 | 1,401 | $54.88 | $76,884.08 |
| 2/18/2022 | 500 | $55.87 | $27,935.00 |
| 2/18/2022 | 1,100 | $57.29 | $63,017.90 |
| 2/18/2022 | 400 | $58.36 | $23,345.20 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/2/2022 | 1,668 | $66.74 | $111,322.32 |
| 3/18/2022 | 400 | $73.64 | $29,455.20 |
| 3/18/2022 | 500 | $74.92 | $37,458.00 |
| 3/18/2022 | 1,131 | $76.22 | $86,203.69 |
| 3/18/2022 | 1,811 | $77.25 | $139,897.94 |
| 3/18/2022 | 3,509 | $78.11 | $274,077.46 |
| 3/18/2022 | 1,149 | $78.84 | $90,582.56 |
| 3/18/2022 | 800 | $73.33 | $58,662.40 |
| 3/18/2022 | 1,600 | $74.76 | $119,614.40 |
| 3/18/2022 | 3,091 | $76.23 | $235,633.11 |
| 3/18/2022 | 4,591 | $77.25 | $354,640.98 |
| 3/18/2022 | 9,472 | $78.06 | $739,346.43 |
| 3/18/2022 | 3,946 | $78.79 | $310,917.18 |
| 4/20/2022 | 10,987 | $67.92 | $746,204.08 |
| 4/20/2022 | 8,120 | $68.69 | $557,795.28 |
| 4/20/2022 | 2,528 | $69.49 | $175,665.66 |
| 4/20/2022 | 693 | $70.35 | $48,753.24 |
| 4/20/2022 | 1,172 | $71.99 | $84,366.42 |
| 4/20/2022 | 4,370 | $67.94 | $296,884.69 |
| 4/20/2022 | 2,643 | $68.76 | $181,743.25 |
| 4/20/2022 | 1,087 | $69.73 | $75,799.77 |
| 4/20/2022 | 400 | $72.12 | $28,846.00 |
| 5/20/2022 | 600 | $50.01 | $30,004.20 |
| 5/20/2022 | 710 | $50.01 | $35,504.26 |
| 6/2/2022 | 769 | $58.31 | $44,840.39 |
| 6/2/2022 | 17,280 | $55.04 | $951,108.48 |
| 6/2/2022 | 46,720 | $55.00 | $2,569,786.88 |
| 8/10/2022 | 7,114 | $65.31 | $464,629.57 |
| 8/10/2022 | 1,700 | $66.14 | $112,438.00 |
| 8/10/2022 | 17,177 | $65.16 | $1,119,184.61 |
| 8/10/2022 | 1,009 | $66.22 | $66,811.94 |
| 8/10/2022 | 71,388 | $65.18 | $4,653,141.23 |
| 8/10/2022 | 1,612 | $66.20 | $106,716.01 |
| 9/2/2022 | 834 | $57.66 | $48,088.44 |
| 10/11/2022 | 4,500 | $55.00 | $247,500.00 |
| 11/11/2022 | 29,000 | $0.00 | $0.00 |
| 11/15/2023 | 11,179 | $65.11 | $727,875.87 |
| 11/15/2023 | 2,700 | $65.69 | $177,352.20 |
| 11/15/2023 | 1,500 | $67.05 | $100,576.50 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/15/2023 | 3,221 | $67.83 | $218,486.87 |
| 11/15/2023 | 12,363 | $65.15 | $805,449.45 |
| 11/15/2023 | 1,490 | $65.91 | $98,210.37 |
| 11/15/2023 | 3,635 | $67.48 | $245,286.17 |
| 11/15/2023 | 1,112 | $68.06 | $75,682.72 |
| 12/2/2022 | 871 | $58.81 | $51,225.25 |
| 12/15/2022 | 1,001 | $57.33 | $57,386.33 |
| 12/15/2022 | 608 | $58.78 | $35,736.42 |
| 12/15/2022 | 2,566 | $59.92 | $153,762.42 |
| 12/15/2022 | 700 | $60.27 | $42,189.00 |
| 12/15/2022 | 100 | $62.13 | $6,213.00 |
| 12/15/2022 | 1,100 | $57.36 | $63,090.50 |
| 12/15/2022 | 746 | $58.85 | $43,904.34 |
| 12/15/2022 | 2,929 | $60.07 | $175,942.10 |
| 12/15/2022 | 200 | $62.13 | $12,426.00 |
| 1/11/2023 | 4,500 | $55.00 | $247,500.00 |
| 1/12/2023 | 5,450 | $60.00 | $327,000.00 |
| 2/13/2023 | 2,700 | $60.07 | $162,199.80 |
| 2/13/2023 | 1,675 | $61.07 | $102,290.58 |
| 2/13/2023 | 600 | $61.88 | $37,127.22 |
| 2/13/2023 | 2,700 | $60.08 | $162,216.00 |
| 2/13/2023 | 1,875 | $61.11 | $114,581.25 |
| 2/13/2023 | 400 | $61.97 | $24,788.00 |
| 3/2/2023 | 2,556 | $61.39 | $156,907.73 |
| 3/13/2023 | 2,050 | $55.45 | $113,674.55 |
| 3/13/2023 | 200 | $56.14 | $11,227.20 |
| 3/13/2023 | 2,050 | $55.41 | $113,586.40 |
| 3/13/2023 | 200 | $56.14 | $11,228.20 |
| 3/14/2023 | 5,450 | $60.00 | $327,000.00 |
| 6/5/2023 | 1,212 | $43.89 | $53,193.47 |
| 7/17/2023 | 18,000 | $55.24 | $994,392.00 |
| 9/5/2023 | 1,344 | $52.62 | $70,726.66 |
| 12/4/2023 | 1,368 | $58.53 | $80,074.51 |
| 12/4/2023 | 12,402 | $58.18 | $721,535.96 |
| 12/4/2023 | 8,251 | $58.84 | $485,497.09 |
| 12/4/2023 | 1,347 | $59.78 | $80,526.35 |
| 12/4/2023 | 13,776 | $58.22 | $802,024.94 |
| 12/4/2023 | 7,003 | $58.92 | $412,602.75 |
| 12/4/2023 | 1,221 | $59.81 | $73,021.91 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 1/4/2024 | 13,028 | $55.85 | $727,600.77 |
| 1/4/2024 | 8,972 | $56.36 | $505,652.95 |
| 1/4/2024 | 13,191 | $55.85 | $736,717.35 |
| 1/4/2024 | 8,809 | $56.36 | $496,484.05 |
| 2/5/2024 | 13,776 | $59.34 | $817,509.17 |
| 2/5/2024 | 8,134 | $60.01 | $488,121.34 |
| 2/5/2024 | 100 | $60.96 | $6,095.60 |
| 2/5/2024 | 15,429 | $59.39 | $916,251.17 |
| 2/5/2024 | 6,471 | $60.08 | $388,797.09 |
| 2/5/2024 | 100 | $60.87 | $6,086.80 |
| 3/4/2024 | 3,185 | $64.02 | $203,913.26 |
| 3/4/2024 | 1,949 | $63.34 | $123,457.46 |
| 3/4/2024 | 9,051 | $64.05 | $579,734.65 |
| 3/4/2024 | 1,862 | $63.34 | $117,944.67 |
| 3/4/2024 | 9,138 | $64.05 | $585,270.62 |
| 4/4/2024 | 4,573 | $56.14 | $256,746.51 |
| 4/4/2024 | 5,026 | $57.39 | $288,442.14 |
| 4/4/2024 | 1,401 | $57.92 | $81,144.52 |
| 4/4/2024 | 5,067 | $56.23 | $284,922.48 |
| 4/4/2024 | 5,333 | $57.52 | $306,748.83 |
| 4/4/2024 | 600 | $57.99 | $34,795.80 |
| **Total** | **696,210** | | **$44,111,577.84** |

22. Defendant Peter Barris ("Barris") has served as a member of the Board since February 2011, and as the lead independent director since 2024. For the Company's fiscal year 2023, defendant Barris received in fees or cash $42,500 and $179,988 in stock awards for a total of $222,488. For the Company's fiscal year 2022, defendant Barris received in fees or cash $42,500 and $179,968 in stock awards for a total of $222,468. For the Company's fiscal year 2021, defendant Barris received in fees or cash $37,500 and $159,991 in stock awards for a total of $197,491.

23. Defendant Steven Collins ("Collins") has served as a member of the Board since August 2019 and has been a member of its Audit Committee since 2019, sitting as Chair since 2019. Defendant Collins has also served as a member of the Compensation Committee since 2019.

For the Company's fiscal year 2023, defendant Collins received in fees or cash $62,500 and $179,988 in stock awards for a total of $242,488. For the Company's fiscal year 2022, defendant Collins received in fees or cash $62,500 and $179,968 in stock awards for a total of $242,468. For the Company's fiscal year 2021, defendant Collins received in fees or cash $57,500 and $159,991 in stock awards for a total of $217,491. During the Relevant Period, defendant Collins sold 5,000 shares of Company stock for proceeds of $650,000 as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/8/2021 | 2,500 | $129.80 | $324,500.00 |
| 11/8/2021 | 2,500 | $130.20 | $325,500.00 |
| **Total** | **5,000** | | **$650,000.00** |

24. Defendant Raina Moskowitz ("Moskowitz") has served as a member of the Board since December 2020 and has been a member of its Audit Committee since 2020. Defendant Moskowitz has also served as a member of the Compensation Committee since 2021, sitting as Chair since 2021. For the Company's fiscal year 2023, defendant Moskowitz received in fees or cash $60,000 and $179,988 in stock awards for a total of $239,988. For the Company's fiscal year 2022, defendant Moskowitz received in fees or cash $60,000 and $179,968 in stock awards for a total of $239,968. For the Company's fiscal year 2021, defendant Moskowitz received in fees or cash $47,167 and $73,647 in stock awards for a total of $120,814.

25. Defendant Thomas Stanley ("Stanley") has served as a member of the Board since June 2021 and has been a member of its Compensation Committee since 2021. For the Company's fiscal year 2023, defendant Stanley received in fees or cash $50,000 and $179,988 in stock awards for a total of $229,988. For the Company's fiscal year 2022, defendant Stanley received in fees or cash $50,000 and $169,639 in stock awards for a total of $219,639. For the Company's fiscal year 2021, defendant Stanley received in fees or cash $22,554 and $239,952 in stock awards for a

total of $262,506. During the Relevant Period, defendant Stanley sold 900 shares of Company stock for proceeds of $59,229 as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 8/15/2022 | 900 | $65.81 | $59,229.00 |
| **Total** | **900** | | **$59,229.00** |

26.     Defendant Karen Walker ("Walker") has served as a member of the Board since August 2019 and has been a member of its Audit Committee since 2019. Defendant Walker also served as a member of the Compensation Committee from 2019 to 2021. For the Company's fiscal year 2023, defendant Walker received in fees or cash $57,000 and $179,988 in stock awards for a total of $236,988. For the Company's fiscal year 2022, defendant Walker received in fees or cash $57,000 and $179,968 in stock awards for a total of $236,968. For the Company's fiscal year 2021, defendant Walker received in fees or cash $60,306 and $159,991 in stock awards for a total of $220,297. During the Relevant Period, Defendant Walker sold 65,320 shares of Company stock for proceeds of over $5 million as shown in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/8/2021 | 10,250 | $131.28 | $1,345,568.75 |
| 11/8/2021 | 4,750 | $132.13 | $627,631.75 |
| 8/29/2022 | 8,500 | $59.11 | $502,452.00 |
| 8/30/2022 | 400 | $58.97 | $23,588.00 |
| 11/17/2022 | 3,987 | $61.87 | $246,675.69 |
| 11/17/2022 | 3,987 | $61.96 | $247,034.52 |
| 11/17/2022 | 3,987 | $62.03 | $247,313.61 |
| 11/18/2022 | 3,800 | $60.56 | $230,128.00 |
| 11/18/2022 | 1,200 | $61.11 | $73,332.00 |
| 3/8/2023 | 5,900 | $63.59 | $375,151.50 |
| 3/8/2023 | 2,100 | $64.83 | $136,149.30 |
| 3/8/2023 | 6,000 | $64.56 | $387,366.00 |
| 8/9/2023 | 986 | $44.55 | $43,926.30 |
| 8/9/2023 | 986 | $44.58 | $43,950.95 |
| 8/9/2023 | 987 | $44.57 | $43,986.64 |

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 9/1/2023 | 4,000 | $52.88 | $211,536.00 |
| 3/4/2024 | 3,500 | $64.24 | $224,847.00 |
| **Total** | **65,320** | | **$5,010,638.01** |

27. The following Defendants are hereinafter referred to as the "Individual Defendants": Howard, Barretto, Del Preto, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker.

28. The following Individual Defendants are collectively referenced herein as the "Director Defendants": Howard, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker.

29. The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Howard, Barretto, Del Preto, Rankin, Collins, Stanley, and Walker.

30. The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Collins, Moskowitz, and Walker.

31. The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Howard, Barretto, and Del Preto.

32. The Individual Defendants and Nominal Defendant are collectively referenced herein as the "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

33. At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Sprout Social.

34. Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are

required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

35. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

36. Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

37. Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

38. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Sprout Social were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality

performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

39. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

40. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sprout Social.

## SPECIFIC CORPORATE GOVERNANCE
## <u>RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS</u>

41.     The Sprout Social Board has adopted Sprout Social's Code of Ethics and Conduct (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants.

42.     Pursuant to the Code of Conduct "[t]he information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely, and understandable" and the Individual Defendants "are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit material facts about the Company to others, including the Company's independent auditors, governmental regulators, and self-regulatory organizations."

43.     The Code of Conduct also provides that "[a]ll financial books, records, and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to the Company's system of internal controls.  No entry may be made that intentionally hides or disguises the true nature of any transaction." "Covered Parties", which includes all directors, officers, and employees, are therefore required under the Code of Conduct to "be as clear, concise, truthful, and accurate as possible when recording any information."

44.     The Code of Conduct includes the following regarding insider trading:

**No Insider Trading**

Trading on inside information is a violation of federal securities law and is prohibited by the Company's Insider Trading Compliance Policy.  Covered Parties in possession of material nonpublic information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from when they obtain such inside information until adequate public disclosure of the information.  Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question.  To use

non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is unethical and illegal. Covered Parties who trade stock based on insider information may be subject to Company imposed sanctions, including removal or dismissal for cause, and may be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party.

### <u>THE AUDIT COMMITTEE DEFENDANTS OWE ADDITIONAL DUTIES</u>

45. The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Collins, Moskowitz, and Walker during the Relevant Period.

46. Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

#### *Financial Review and Disclosure*

\*　　\*　　\*

4. *Audited Financial Statement Review; Quarterly and Annual Reports.* The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and, as appropriate, "Risk Factors," with management and the auditors. In connection with the Committee's review of quarterly financial statements, discuss significant issues, events and transactions, and any significant changes regarding accounting principles, practices, policies, judgments, or estimates, with management and the auditors.

5. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

6. *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

#### *Internal Controls and Procedures*

7. *Internal Control over Financial Reporting; Disclosure Controls.* The Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls. The Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

8. *Risk Assessment and Risk Management.*  The Committee shall oversee the management of risks associated with the Company's financial reporting, accounting and auditing matters.  The Committee may review the Company's processes and policies with respect to risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company.

## RELEVANT BACKGROUND

47.  Sprout Social is a software company providing a web-based social media management and analytics platform.  The Company's centralized platform "provides the critical business layer to unlock the massive commercial value of social media" for its customers by allowing "organizations of all sizes to create stronger relationships though social media, create and publish effective content, measure and improve performance and better understand their markets and customers."  Sprout Social's software operates across major networks such as X (formerly known as Twitter), Facebook, Instagram, TikTok, Pinterest, LinkedIn, Google, Reddit, Glassdoor and YouTube.

48.  The Company generates revenue primarily from subscriptions under a SaaS business model and purportedly has "more than 31,000 customers across more than 100 countries" with "proven success in the SMB [small-and-medium sized businesses], Mid-market and Enterprise segments."  During the Relevant Period, Sprout Social touted annualized revenue run-rate of subscription agreements ("ARR") as a "Key Business Metric" and "an indicator or the scale of our entire platform while mitigating fluctuations due to seasonality and contract term" and included ARR in each financial report.

49.  At the time of Sprout Social's initial public offering in 2019, the majority of the Company's customer base consisted of smaller customers with monthly contracts.  On May 4, 2021, immediately prior to the Relevant Period, defendant Del Preto reported that the Company was "definitely seeing more . . . enterprise and mid-market" customers with "longer-term

contracts" and that there was "a 50:50 split between month-to-month [and] annual contract[s]." This increase purportedly continued into the Relevant Period, with defendant Howard focusing on, for example, the growth in enterprise business during the second quarter of 2023 on the Company's August 4, 2023 earnings call.

**DEFENDANTS BREACH THEIR DUTIES**
**TO THE COMPANY AND ITS STOCKHOLDERS**

50. Through a series of communications during the Relevant Period, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

51. On November 2, 2021, after the close of the markets, Sprout Social issued a press release announcing its third quarter 2021 financial results (the "3Q21 Press Release"). In the 3Q21 Press Release, defendant Howard stated that the "outperformance this quarter was driven by accelerated momentum in our large-customer cohorts, underscoring the quality of our growth. We're pleased to deliver very strong ACV growth and we see even greater future opportunities as our customers operationalize social."

52. That same day, the Company held an earnings conference call during which defendant Del Preto echoed defendant Howard, stating, *inter alia*, that "[o]ur ongoing momentum into the mid-market enterprise and mix shift towards annual and multiyear contracts are each having a positive impact . . . ." Defendant Howard added that with the Company's "unique go-to-market strategy" the Company "managed to break a series of our own records, this quarter driven by outsized momentum in the mid-market and enterprise segments, which are now collectively approaching 70% of our ARR."

53. When asked what drove the large customer growth by an analyst, defendant Barretto responded, in relevant part:

[G]reat execution from those new market and enterprise teams. And then our marketing team has just done a wonderful job in really focusing in on going after these sophisticated buyers through our SEO and content strategy. And so it's provided us with a really healthy pipeline of big opportunities.

54. Defendant Barretto also responded to a question regarding whether Sprout Social was "thinking about [] establishing direct sales teams that are going to be a lot more outbound focused and going after accounts maybe that you haven't seen[.]" Barretto emphasized in responding that "you'll continue to see us invest in the mid-market -- the marketing approach as well as incapacity, but not a lot has to change in our current motion. We're doing a lot of those things that you mentioned at the beginning of your question already today[.]"

55. During the Barclays Global Technology, Media and Telecommunications Conference held on December 7, 2021, defendant Del Preto responded as follows to a question about the drivers for the Company's accelerating growth:

I think there's a couple of things going on there. I think first, on the new business side, we've just seen an increased amount of execution from the sales team. And there's a couple of things going on there. One is given the fact that we're 90% inbound with our trial model, right? We have a lot of data and information. We can understand the quality of those trials and leads and demos. And so we've been able to more efficiently kind of get those out to the sales teams, have them work on the more higher value, more likely to close type opportunities. So because of that, we've been just a little bit more efficient on the go-to-market side. The other thing we're doing and this has probably helped us more in the mid-market enterprise as we're getting pulled more upmarket is, we started to make some changes in our marketing strategy and our content strategy. Historically, we've built a lot of our content, built out for the practitioner, how do you do things day-to-day. But what we found is as we're getting pulled into more C-level conversations, we're getting these larger enterprises with CMOS, heads of customer care. We're starting to build out more of our content that's targeted to more of that senior level person at these organizations. So because of that, we're getting into more of these conversations, more of these larger deals, and so that's kind of led to that growth.

56. At the same conference, when asked about whether Sprout Social needed to adjust between different sales models for smaller and large clients, defendant Barretto stated that:

[O]ne thing that I think is really important here is that we are doing both of those things today. So we have that inbound motion that's been a huge part of the

foundation and the DNA of the organization and we've complemented that with outbound sales as well. And that's a big part of our mid-market and enterprise play today.

57. On February 22, 2022, after market close, the Individual Defendants caused Sprout Social to issue a press release announcing the Company's fourth quarter and full-year 2021 financial results (the "4Q21 Press Release"). The 4Q21 Press Release touted the Company's revenue and ARR as increasing 43% and 42%, respectively, compared to the same quarter in the prior year.

58. The Company also held an earnings conference call on February 22, 2022, during which defendant Howard stated that Sprout Social was "seeing great progress across all segments of our market with our focused investments in the mid-market and enterprise leading to our strongest quarter as a public company." Defendant Barretto further explained that the Company was:

> [T]aking the friction out of customer adoption and accelerating our product lead sales motion to deliver an even more efficient go-to-market model, and we're doing it at scale. While our current execution remains incredibly strong, our enterprise and mid-market teams drop the mic during Q4. Our investments and sales capacity, onboarding and success have been well aligned to the inbound customer demand signals we see.

59. During the earnings call on February 22, 2022, defendant Barretto also noted that "we still get a significant amount of pipeline in the enterprise every single month, which is setting up our teams to be able to execute and we're still running at sales cycle that runs between 30 to 45 days on average, and we will see deals in the mid-market and enterprise that hit those timelines." Defendant Barretto went on to explain that the Company's go-to-market strategy "creates rapid sales cycles for us."

60. In response to an analyst questioning whether there were "any major technical areas or lack of certain feature sets in your offering today that you feel still notable headwinds

to . . . landing larger customer deals[,]" defendant Howard emphasized that the Company was "well equipped for the deals that are out there" and that "there's not anything that we would look to and put on the board as deficiencies[.]"

61. On May 3, 2022, Sprout Social issued a press release announcing its first quarter 2022 financial results (the "1Q22 Press Release"). The 1Q22 Press Release stated that the Company's revenue and ARR increased by 41% and 39%, respectively, compared to the same quarter in the prior year. Defendant De Preto was quoted in the 1Q22 Press Release, stating, in relevant part:

> Our go-to-market investments are paying off now, and our product investments are expanding our foundation for durable growth. Following another quarter of solid execution and with a strong pipeline, we are pleased to raise our 2022 guidance and expect to deliver faster growth with better efficiency than our prior forecast.

62. That same day, the Company held an earnings call during which defendant Barretto stated that "our mid-market and enterprise teams continue to deliver outstanding new business performance [in] what is typically a seasonally slower enterprise quarter." Defendant Barretto also touted growth rate for Sprout Social as resulting from the "combination of increasing use cases, expanding seat counts, rising premium module attach rates and the steady drumbeat of upmarket expansion[.]"

63. On August 2, 2022, the Company issued a press release announcing its second quarter 2022 financial results (the "2Q22 Press Release"). The 2Q22 Press Release stated that revenue and ARR had again increased, this time by 37% and 35%, respectively, compared to the same quarter the previous year. The 2Q22 Press Release also quoted defendant Del Preto stating:

> Our business model is resilient, our execution is consistent and we have high confidence in the durability of our near and long term growth. Behind strong execution and record enterprise new business pipeline, we are pleased to raise our 2022 guidance and expect to deliver 100bps faster growth, with better efficiency than our prior forecast.

64.     During the earnings call held the same day, defendant Howard stated, *inter alia*, that "the consistency of [the Company's] performance and durability of our growth this quarter was driven by outsize[d] contributions from our mid-market and enterprise segments." Defendant Howard also added, in relevant part, that:

> [W]e're continuing to see the shift that really started kind of the middle of last year, where our emphasis and investment priorities have really become more focused on the mid-market enterprise. And we're seeing some mix shift in the customer base, not only in the new lands[,] [b]ut also in the top of the funnel and the people that we're targeting and swapping out some of the highest volume lower end of the market opportunities with some of the bigger ones which you're seeing in the momentum that we've gotten, the mid-market the enterprise . . . .

65.     On November 3, 2022, Sprout Social issued a press release announcing its third quarter 2022 financial results (the "3Q22 Press Release"). The 3Q22 Press Release stated that the Company's revenue and ARR had each increased by 33%, compared to the same quarter in the prior year, and quoted defendant Howard as stating that the Company "expected record net new ARR in Q4[.]" Defendant Del Preto was also quoted, stating, "[o]ur execution remains strong and our business model continues to highlight its resiliency. As we begin to appropriately monetize our platform with announced pricing changes throughout Q4, we expect ACV growth to meaningfully accelerate into and through 2023."

66.     On the related earnings call the same day, an analyst questioned the Company's plans for its enterprise customers and whether they were "looking to make any changes around the go-to-market or the sales motion, either with more upon sales hires or enterprise-focused sales individuals." Defendant Barretto responded:

> We're already doing a lot of those things today. So it's probably just continuing to invest there. So if I think about just the teams themselves, we have some great enterprise leadership and sellers that are already in the marketplace today that are closing a lot of these accounts are growing these accounts that we've spoken about. We're continuing to invest on those teams. We see a tremendous opportunity in front of us from a marketing perspective.

You'll see a lot of our focus and investment going into marketing to those large sophisticated customers forms of things like account-based marketing. We also have continued to grow our outbound BDR teams that are building pipeline within those accounts.

And I also underline, even though we're doing all those traditional enterprise strategies, we also still leverage the product like we always have. So our customers continue to come in and trial the product that continues to be a major differentiator for us even in the enterprise, and it's 1 of our #1 plays is get their hands on the keyboard. And so for us, we love that in the enterprise, massive differentiator, and so we'll continue to be working on that as well.

67. During the Barclays Global Technology, Media and Telecommunications Conference held on December 7, 2022, defendant Del Preto asserted that "we haven't seen a major change in the way we win business. It's still 90% of it comes inbound, even up in the mid-market enterprise." De Preto responded to a question about how the Company "create[s] flexibility" in uncertain business environments, stating that "we have pretty good indications on how to manage this in uncertain times," and pointing to the "tight sales cycle[,]" which gives "a pretty good understanding of how quickly those investments are working or not working."

68. On February 21, 2023, Sprout Social issued a press release announcing its fourth quarter and full-year 2022 financial results (the "4Q22 Press Release"). The 4Q22 Press Release highlighted revenue and ARR growth of 31% and 42%, respectively, compared to the same quarter the prior year. The 4Q22 Press Release also quoted defendant Howard stating that Sprout Social had "achieved multiple new high water marks in both new business and expansion, led by outstanding new business momentum in the enterprise. Our pricing changes are performing well, our partnerships are strengthening and social has never been more critical to our customers." Defendant Del Preto was also quoted, emphasizing that "[t]he quality of our financial model is improving as we continue to deliver durable, efficient growth. Led by very strong momentum in the mid market & enterprise, successful monetization changes and a rapidly maturing market opportunity, we expect to deliver accelerating ARR growth in 2023."

69.     The Company held an earnings conference call the same day during which defendant Barretto stated that one of the factors "contributing to the success that we're continuing to see in the enterprise" was that:

> [O]ur teams have done an amazing job both driving awareness in the enterprise, but also executing really well against these opportunities, going out and building pipeline with these accounts, taking great care of these customers through the evaluation process as well as when we win them and making sure that they get implemented quickly and that they're getting great user adoption.

70.     During the same earnings call, when asked if the "trial-led go-to-market model resonate[s] as well at the high end of the market[,]" defendant Barretto claimed that:

> [W]e are incredibly excited about that trial motion, especially in the enterprise, because it is incredibly differentiated.  Most enterprise solutions, certainly in our space, but I think in many software categories, don't lead with a product in the enterprise.  They usually lead with really heavily customized demos and really long sales cycle times and heavy services and that's the opposite of the way that we approach the market.

71.     On May 2, 2023, Sprout Social issued a press release announcing its first quarter 2023 financial results (the "1Q23 Press Release").  The 1Q23 Press Release stated that the Company's revenue and ARR increased by 31% and 30%, respectively, compared to the same quarter in the prior year.

72.     The Company held an earnings call the same day during which defendant Howard highlighted that "the shift away from our inefficient low-end business, consistent growth in the healthiest tiers of our business and renewed top-of-funnel demand through March and April positively impacted net new ARR performance in April with enterprise being a positive outlier."

73.     During the same call, defendant Barretto commented that:

> From a customer success perspective, we shifted some of those resources that were on the noncore business up into the strategic customers in mid-market and enterprise.  So we're doing a much better job there as well, helping those customers, improving the ratios and enabling us to not just improve that gross retention but also to give us a lot more of a foundation to expand from, so investments going through all of those today.  In terms of the dynamics of what's changed on the sales

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

motion, it's a lot of the same things that we've historically been doing. We've been adding more talent that's been used to selling in the enterprise.

74. On August 3, 2023, after the close of the markets, Sprout Social issued a press release announcing that it had acquired Tagger, "a leading influencer marketing and social intelligence platform[,]" for cash consideration of $140 million which was "funded with a combination of cash from Sprout Social's balance sheet and Sprout's newly established revolving credit facility." The press release noted that the "[a]cquisition expands Sprout Social into the influencer marketing category and extends social media platform to deliver comprehensive workflow, reporting and intelligence."

75. On August 3, 2023, Sprout Social also issued a press release announcing its second quarter 2023 financial results (the "2Q23 Press Release"). The 2Q23 Press Release stated that the Company's revenue and ARR increased by 29% and 27%, respectively, compared to the same quarter in the prior year. In the 2Q23 Press Release, defendant Del Preto touted the Tagger acquisition, stating, "[o]ur enterprise business is accelerating, while we cycle out unprofitable revenue. We believe the addition of Tagger will strategically accelerate our momentum as Sprout paces towards our new $1B subscription revenue target."

76. The same day, the Company held an earnings call during which defendant Howard emphasized the importance of the Tagger acquisition, stating "[i]nfluencer and creator marketing has quickly increased in customer demand given how critical this category has become to a brand's awareness and brand strategy. In fact, we currently see influencer marketing in more than half of our enterprise RFPs."

77. In commenting on the acquisition, defendant Barretto also stated that Defendants "knew immediately that Tagger would make for an incredible fit with Sprout. The software is powerful and elegant and the team is hungry to design a category. We believe our depth and scale

will allow Tagger's product to innovate and grow at an accelerated pace and our go-to-market motion is perfectly suited to accelerate Tagger's growth and drive even more customer success." Defendant Barretto later added that with Tagger:

> [F]rom a sales cycle perspective, the other piece that was just exciting for us is, as we spent time with the go to market team, their sales cycles aren't quite as rapid as ours, with our trial model, but they are fast for enterprise. And we believe that from what we have seen, and how we are running the rest of our cycles, that they can attach nicely in the work that we are doing without elongating our core business.

78. Defendant Barretto confirmed that "influencer is a customer requirement showing up in more than half of our enterprise conversations." He went on to add that "Tagger's ACVs are meaningfully above Sprout's, and we believe we will now have the most comprehensive and competitively differentiated set of solutions in each of our markets[,]" emphasizing that "our new business win rates and ACVs are set to move higher in our core business as we combine forces." These revelations meant that the Company did not previously have the ability to address a critical need for the majority of its target market.

79. Analysts did not respond positively to the Tagger acquisition with CG Capital Markets questioning whether the Company was "making an acquisition to mask deteriorating growth." Cantor Fitzgerald commented that it "further complicates the story, as there is a lot of noise surrounding [Sprout Social's] customer count and go-to-market strategy," noting that although there are potential benefits and opportunities arising from the acquisition, they "cannot overlook the opportunity cost associated with a $140m purchase price for a company that is projecting ~$6m of revenue in 2023E and ~$15m in revenue for 2024E." Because the estimated annual interest expense on the funds used to purchase Tagger was $6 million to $8 million, the Company was "likely to pay more in interest expense in 2024E than the revenue that Tagger is going to generate in 2023E (~$6m)." Piper Sandler stated that the "biggest outstanding question is on the enterprise pipeline in the back half" of the year.

80.     On this news, Sprout Social's stock price dropped $6.57 per share, or 12.3%, from a closing price of $53.38 per share on August 3, 2023, to close at $46.81 per share on August 4, 2023, on unusually heavy trading volume.  However, Defendants continued issuing false and misleading statements and omitting material adverse information in their public statements for another nine months, misrepresenting the Company's enterprise customer growth and the effects of the Tagger acquisition.

81.     During the Company's September 27, 2023 Investor Day conference, when asked whether there would be changes to the sales team staffing and resources as a result of the Company's growing mid-market and enterprise business, defendant Barretto responded:

> [T]he short answer is just the go-to-market motion is the exact same for us. . . .  We lead with the product, we lead with the trial.  Our entire team is enabled on understanding the entire ecosystem and the integrations that we have across a variety of technology platforms.  And to Justyn's point, we -- as we were focusing in more on the more sophisticated customers.  We shifted headcount internally as we turned the year and wanted this year to make sure that we felt really great about the capacity that we had in places like mid-market and enterprise and places like solution engineering that support the enterprise and places like customer success that we're supporting some of our larger customers.

82.     On November 2, 2023, Sprout Social issued a press release announcing its third quarter 2023 financial results for the period ended September 30, 2023 (the "3Q23 Press Release"). The 3Q23 Press Release stated that the Company's revenue and ARR increased by 31% and 33%, respectively, compared to the same quarter in the previous year.  In the 3Q23 Press Release, defendant Del Preto is quoted as stating, "[o]ur focused investments are delivering strong returns" and that the Company's "current performance and leading indicators performed well during Q3 led by the rapidly changing mix of our business and further acceleration in our enterprise segment. Tagger overperformed our expectations right out of the gate."

83.     During the related earnings call on November 2, 2023, defendant Howard touted the Company's integration of Tagger, stating:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Business integration has also progressed smoothly and early customer reception to [T]agger has far exceeded our expectations. Our teams and our products have felt like cousins from the start and we now have differentiated value proposition to deliver for an expanding set of new customers and customer excitement inside our installed base has been headlined by very large enterprise bands . . . .

84. During the same call, defendant Barretto also touted the Company's integration of Tagger with the Company's sales teams. In relevant part, Barretto stated:

We've got the team now working really well across the go-to-market organization embedded into our marketing, our sales, and customer success motions. And then certainly on the product side, our R&D organizations have been working really closely together, not only on the integration, but as we think about 2024 and some of the opportunities in front of us.

85. In response to an analyst's question asking, "what kind of trends you're seeing in sales cycles as you move really up into that kind of large enterprise bucket[,]" defendant Barretto asserted that "we generally have a faster sales cycle than you might see with other enterprise software players, both in our space and outside of it because customers are in the product by the time they make a decision[,]" and "we've seen really good cycles."

86. Defendant Howard likewise responded to a question regarding Sprout Social's growth in enterprise and the sales team, stating, in relevant part:

[W]hen we think about the profile of the enterprise reps that we have on our team, clearly they have some great skills around understanding social and best practices for the enterprise. Our deals move faster than most enterprise organizations. So we expect those reps to have a certain level of speed to them in the way that they execute and to manage more accounts and transactions and deals than they might have at another legacy enterprise player. So the speed and velocity of our business as well as the depth and understanding business strategy is really important for our enterprise team. And we're seeing really good success as demonstrated in the logos that our teams being able to win.

87. On November 6, 2023, Sprout Social filed its third quarter report on Form 10-Q with the SEC (the "Q3 2023 Form 10-Q"), containing Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by defendants Howard and Del Preto, and attesting to the report's accuracy, changes to the internal controls and disclosure of fraud. Therein, the Company

restated the information regarding revenue and ARR contained in the 3Q23 Press Release. The Q3 2023 Form 10-Q also purported to warn investors about risks regarding the Company's integration with Tagger, which had already materialized.

88.     The Q3 2023 Form 10-Q purported to warn that Sprout Social "may be unable to integrate acquired businesses or technologies successfully or achieve the expected benefits of such acquisitions and investments." The Q3 2023 Form 10-Q also stated in relevant part as follows:

> Any investment, business relationship or acquisition, including our acquisitions of Simply Measured, Inc. in December 2017, Repustate in January 2023 and Tagger Media in July 2023 may result in unforeseen operating difficulties and expenditures or business liabilities. In particular, we may encounter difficulties integrating the businesses, technologies, products, personnel or operations of the acquired companies, particularly if key personnel of the acquired company choose not to work for us, the acquired platform, products or services are not easily adapted to work with our platform or products or we have difficulty retaining the customers of any acquired business due to changes in ownership, management or otherwise.

> Acquisitions may also disrupt our business, divert our resources and require significant management and research and development attention that would otherwise be available for development of our existing platform and products. Moreover, the anticipated benefits of any acquisition, investment or business relationship may not be realized, we may be exposed to unknown risks or liabilities or our ability to complete these transactions may often be subject to approvals that are beyond our control. Consequently, these transactions, even if announced, may not be completed.

89.     On February 20, 2024, Sprout Social issued a press release announcing its fourth quarter and full-year 2023 financial results (the "4Q23 Press Release"). The 4Q23 Press Release highlighted revenue and ARR growth of 34% and 30%, respectively, compared to the same quarter the prior year. The Company also touted its positioning and provided investors with promising 2024 financial outlook, stating, in relevant part:

> "We're pleased to share incredibly strong fourth quarter results," said Justyn Howard, Sprout Social's CEO and co-founder. "We're building an enduring software company centered on amazing products, amazing people and overdelivering for our customers every day. We delivered step change growth in current & total contract value bookings and were recently named the #1 best

software product by G2, which we believe position Sprout to build on our momentum in 2024."

\*     \*     \*

"Our execution and leading indicators in Q4 were strong," said Joe Del Preto, CFO. "We've largely moved away from our low end growth anchor. We believe the step change in quality of our Q4 outperformance and notable momentum with leading social-first brands position Sprout to continue to execute well on our journey towards $1B in annual revenue."

For the full year 2024, the Company currently expects:

- Total revenue to be between $425.3 million and $425.5 million.
- Non-GAAP operating income between $15.0 million and $16.0 million.
- This implies year-over-year Non-GAAP operating margin improvement of roughly 220bps.
- Non-GAAP net income per share between $0.22 and $0.23 based on approximately 57.0 million weighted-average shares of common stock outstanding.

90.     During the related earnings call the same day, defendant Barretto noted that:

[C]ustomers are highlighting to us that they're seeing our competitors investing less in their team, in their customers, and in their products. This is reinforcing the strength of our strategy and our differentiation. You can see this in the usability of our platform and how leading with the product has become the primary driver in our strengthening win [rates] in the enterprise.

91.     Defendant Del Preto stated that Sprout Social was "through the final stages" of integration of Tagger and that the Company's sales cycles would be weighted towards the first quarter over time, with "durable" enterprise growth, stating, in relevant part:

Deferred revenue at the end of the quarter was $141.5 million, a record sequential increase. Looking at both our billed and unbilled contracts, RPO totaled $275.0 million, up from $228.7 million exiting Q3, and up 69% year-over-year. We expect to recognize 72% or $198 million of total RPO as revenue over the next 12 months and playing a CRPO growth rate of 62% year-over-year. The acceleration of these metrics reflects our underlying momentum in the enterprise, highlights rapidly improving quality of our business, and revenues are highest ever quarterly total contract value bookings by nearly 80%.

\*     \*     \*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

While working through the final stages of Tagger integration, accounts receivable also increased by nearly double the amount of Q4 2022, reflecting an expanding enterprise renewal base, which we believe will make our cash flow more seasonally weighted towards Q1 over time.

\*     \*     \*

Over the course of 2023, we have aligned our business and our investments around the most productive and fastest growing segments of our market. We believe we transformed our business model to position us to deliver increasingly durable and increasingly efficient growth.

92.     Similarly, in response to an analyst's question, defendant Howard touted Sprout Social's enterprise segment growth and the effective integration of Tagger. In relevant part, defendant Howard stated as follows:

But what we're seeing, and we talked about some of the deals that we did in Q4. We talked about how the size and duration of contracts continues to climb. The seat counts continue to climb.

\*     \*     \*

We see this as a growing opportunity and one that is probably as healthy as it's ever been both in terms of pipeline and our outlook, right? And, I think that the confidence that we have in where we're guiding the revenue for the year is indicative of that. I think that we see Tagger's upside. We see continued acceleration with the Care use cases is upside and a bunch of other things. So that does not reflect our experience or outlook on the market.

93.     In response to an analyst's question, defendant Del Preto further assured investors that "as of now, the entire sales team is now trained up on Tagger. And so it's now in the bag." The following exchange occurred:

**Analyst:** I wonder if you could help us with either the revenue contribution or maybe ARR contribution of Tagger in the quarter and then ultimately kind of what's baked into growth rates for 2024 coming from Tagger?

**Defendant Del Preto:** Yeah, so Matt, I'll take that one. A couple of things here, we didn't explicitly call out the Tagger contribution in Q4, I think what we talked about coming out of the acquisition that you can kind of model out $3 million over the final 5 months of the year. And we talked about, we were a little ahead of that in Q3, and we swung outperform that in Q4. So that'll kind of give you the cadence of the revenue contribution that we had in the quarter. And then ARR, we talked

about, it was a small contribution. It was not a huge number, like I said, just given that we're just ramping up the team.

If we think about 2024, as of now, the entire sales team is now trained up on Tagger. And so it's now in the bag, and Ryan talked about this, and they're going to sell it just like premium analytics or social listening. And so it's not like we have a separate target for Tagger. It's just going to be part of the overall kind of go-to-market motion. And so because of that, we're not specifically kind of calling out what's the Tagger number, because we're not managing that as like a separate product as we get into 2024.

94.   In response to an analyst's question regarding "whether the go-to-market strategy has been modified at Tagger," defendant Barretto responded:

From a go-to-market perspective, I mean part of it for us as we've been integrating the teams and getting up to speed is being really cross-training all of the folks on our team from an AE and a solution engineering and a customer success perspective so that we're fully up to speed with all the things in influencer marketing.

95.   Defendant Barretto also responded to a question regarding how employees were being "repurposed or utilized" as a result of the "de-emphasis on the SMB business." In relevant part, he stated that "a lot of that transition was happening through 2023[,]" giving "a lot more focus to the marketing team on the places that we really want to drive, inbound pipeline and opportunity. And even the marketing strategies upmarket and the mid-market and enterprise and the approaches we can take . . . ." Defendant Barretto went on to add, in relevant part:

[I]f you're not hand-holding really small customers that may not truly understand social who – by the way end up taking up as much resources oftentimes as the enterprise, you're able to redeploy your resources to focus in on those more social first sophisticated customers. So we're seeing it across the board and I think the best way to just think about it is the redeployment of our resources towards those sophisticated customers in the core.

96.   On February 23, 2024, Sprout Social filed its full year report on Form 10-K with the SEC (the "2023 Form 10-K") signed by defendants Howard, Del Preto, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker, and containing Exchange Act and SOX certifications signed by defendants Howard and Del Preto attesting to the report's accuracy, changes to the internal controls

and disclosure of fraud.  The 2023 Form 10-K also purported to warn about substantially similar risks as discussed in ¶¶ 87-88, *supra*.  Specifically, the 2023 Form 10-K stated the following, in relevant part:

> We may make acquisitions of, or invest in, other businesses or technologies, which may divert our management's attention and result in the incurrence of indebtedness or dilution to our stockholders.  We may be unable to integrate acquired businesses or technologies successfully or achieve the expected benefits of such acquisitions and investments.

> We may evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future.  We also may enter into relationships with other businesses to expand our platform and products, which could involve preferred or exclusive licenses, additional channels of distribution, discount pricing or investments in other companies.

> Any investment, business relationship or acquisition, including our acquisitions of Repustate in January 2023 and Tagger Media in August 2023, may result in unforeseen operating difficulties and expenditures or business liabilities.  In particular, we may encounter difficulties integrating the businesses, technologies, products, personnel or operations of the acquired companies, particularly if key personnel of the acquired company choose not to work for us, the acquired platform, products or services are not easily adapted to work with our platform or products or we have difficulty retaining the customers of any acquired business due to changes in ownership, management or otherwise.  Acquisitions may also disrupt our business, divert our resources and require significant management and research and development attention that would otherwise be available for development of our existing platform and products.  Moreover, the anticipated benefits of any acquisition, investment or business relationship may not be realized, we may be exposed to unknown risks or liabilities.

97.     On March 6, 2024, during the KeyBanc Emerging Technology Summit, defendant Barretto responded to a question asking about the "velocity of sales cycle upmarket[,]" stating, in relevant part, that "even in the mid-market and enterprise, there's great velocity in our business."

98.     The above statements identified in ¶¶ 51-97 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose *inter alia*, that:  (i) the Company's sales and revenue growth were not indicative of the Company's growth as it

transitioned to an enterprise sales cycle; (ii) the Company did not have the ability to sell to enterprise customers, failing to execute its purported "unique go-to-market strategy" for those customers; (iii) as a result, the Company overpaid for Tagger and faced integration challenges with the acquisition; (iv) as a result, the Company was experiencing longer sales cycles and a slowing pipeline; (v) consequently, the Company would revise fiscal year 2024 revenue guidance; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

**THE INDIVIDUAL DEFENDANTS ISSUE**
**FALSE AND MISLEADING PROXY STATEMENT**

99.    On April 8, 2022, defendants Howard, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker reviewed, approved, and caused the Company to file a proxy statement (the "2022 Proxy Statement") on Form DEF 14A with the SEC, which was filed pursuant to Section 14(a) of the Exchange Act.

100.    In the 2022 Proxy Statement, the Board sought shareholder approval for, *inter alia*, (1) the re-election of defendants Collins and Rankin to the Board for a three-year term ending as of the Company's annual meeting of stockholders in 2025, (2) the ratification of the appointment of PricewaterhouseCoopers LLP ("PwC") as the Company's Independent Registered Public Accounting Firm for the year-ending December 31, 2022, and (3) in a non-binding advisory vote, the compensation of the Company's named executive officers, including defendants Howard, Barretto, Del Preto and Rankin, commonly referred to as "Say-on-Pay." The 2022 Proxy Statement contained material misstatements and omissions.

101.    The 2022 Proxy Statement stated that as a nominee defendant Collins was qualified based on his "extensive finance and software industry experience as well as his strong business

acumen and leadership skills." Rankin was qualified based on his "in-depth knowledge of [Sprout Social's] business from serving as one of [its] founders and as Chief Technology Officer[.]"

102. Regarding corporate governance, the 2022 Proxy Statement stated that the Company's "corporate governance procedures and practices [] are designed to enhance [its] shareholders' interests."

103. The 2022 Proxy Statement also claimed that Sprout Social's Code of Conduct "addresses items such as":

- conflicts of interest;
- disclosures;
- compliance with laws, rules and regulations;
- insider trading;
- reporting, accountability and enforcement;
- corporate opportunities;
- confidentiality and protection and proper use of Company assets; [and]
- fair dealing.

104. The 2022 Proxy Statement also specified that the Audit Committee's duties included, among other things:

- appointing, compensating, retaining and overseeing our independent registered public accounting firm;
- discussing with our independent registered public accounting firm its independence from management;
- reviewing with management and our independent registered public accounting firm the results of their audit;

\*       \*       \*

- overseeing the financial reporting process and discussing with management and our independent registered public accounting firm the interim and annual financial statements that we file with the SEC;
- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements;
- reviewing and discussing with management, internal auditors and, if applicable, our independent registered public accounting firm the adequacy and effectiveness of our internal controls and reviewing and discussing the

adequacy and effectiveness of the Company's disclosure controls and procedures;

- reviewing our processes and policies with respect to risk identification, management and assessment;
- overseeing management of risks associated with financial reporting, accounting and auditing matters;
- reviewing related party transactions; and
- establishing procedures for the confidential and anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

105. The 2022 Proxy Statement included the following, in relevant part, regarding "Risk Management":

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, competitive, legal and compliance, cybersecurity, privacy, platform and product innovation and reputational. We have designed and implemented processes to manage such risks. Although management is responsible for the day-to-day risks we face, one of the key functions of our board of directors is to oversee our risk management process. Our board of directors focuses on our general risk management strategy, the most significant risks facing us and oversees the implementation of risk mitigation strategies by management.

Our board of directors is also apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions. The committees of our board of directors oversee and review risks that are inherent in their respective areas of oversight. The board of directors periodically receives reports by each committee chair regarding the committee's considerations and actions. The board of directors' allocation of risk oversight responsibility may change from time to time based on the evolving needs of the Company.

106. On April 7, 2023, defendants Howard, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker reviewed, approved, and caused the Company to file a proxy statement (the "2023 Proxy Statement") on Form DEF 14A with the SEC, which was filed pursuant to Section 14(a) of the Exchange Act.

107. In the 2023 Proxy Statement, the Board sought shareholder approval for, *inter alia*, (1) the re-election of defendants Barris, Moskowitz, and Walker to the Board for a three-year term ending as of the Company's annual meeting of stockholders in 2026, (2) the ratification of the

appointment of PwC as the Company's Independent Registered Public Accounting Firm for the year-ending December 31, 2023, and (3) in a non-binding advisory vote, the compensation of the Company's named executive officers, including defendants Howard, Barretto, Del Preto, and Rankin, commonly referred to as "Say-on-Pay." The 2023 Proxy Statement contained material misstatements and omissions.

108. The 2023 Proxy Statement stated that as a nominee defendant Moskowitz was qualified based on her "significant experience growing and leading online customer-facing businesses[,]" and likewise defendant Walker was qualified based on her "extensive experience in the information technology industry and her business expertise in marketing and digital experience." Barris was qualified because he had "more than 20 years of experience in finance and has served on other public company boards of directors."

109. The 2023 Proxy Statement included the same, or substantially similar, false and misleading statements regarding Sprout Social's corporate governance, Code of Conduct, Audit Committee, and risk management as in the 2022 Proxy Statement, and fully described above at ¶¶ 102-105.

110. On April 8, 2024, Sprout Social filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy Statement"). Defendants Howard, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act. The 2024 Proxy Statement contained material misstatements and omissions.

111. The 2024 Proxy Statement asked Sprout Social stockholders to vote to, among other things, (1) reelect defendants Howard and Stanley to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2027; (2) ratify the appointment of PwC as Sprout Social's independent registered public accounting firm for the fiscal year ending

December 31, 2024; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, including defendants Howard, Barretto, Del Preto, and Rankin commonly referred to as "Say-on-Pay."

112. The 2024 Proxy Statement stated that as a nominee defendant Howard was qualified based on his "in-depth knowledge and leadership[.]" Stanley was qualified "because of his software executive experience in sales, go-to-market strategy, and partnerships."

113. The 2024 Proxy Statement included the same, or substantially similar, false and misleading statements regarding Sprout Social's corporate governance, Code of Conduct, Audit Committee, and risk management as in the 2022 Proxy Statement, and fully described above at ¶¶ 102-105.

114. The 2022, 2023 and 2024 Proxy Statements were materially misleading because each failed to disclose that: (i) although Sprout Social claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated the Code of Conduct; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Sprout Social to issue false and misleading statements; (iii) the Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information; and (iv) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

115. Furthermore, the 2022, 2023, and 2024 Proxy Statements were false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over

the Company's core operations and to manage risks associated with the essential and mission-critical maintenance of existing subscribers and addition of new ones.

116.    The 2022, 2023, and 2024 Proxy Statements were also materially misleading because each failed to disclose, *inter alia*, that:  (i) the Company's sales and revenue growth were not indicative of the Company's growth as it transitioned to an enterprise sales cycle; (ii) the Company did not have the ability to sell to enterprise customers, failing to execute its purported "unique go-to-market strategy" for those customers; (iii) as a result, the Company overpaid for Tagger and faced integration challenges with the acquisition; (iv) as a result, the Company was experiencing longer sales cycles and a slowing pipeline; (v) consequently, the Company would revise fiscal year 2024 revenue guidance; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

### THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

117.    During the period of wrongdoing described above, Sprout Social insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

118.    The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- As fully described above, during the Relevant Period, defendant Howard sold 770,658 shares of Company stock for proceeds of over $46.7 million.

- As fully described above, during the Relevant Period, defendant Del Preto sold 68,759 shares of Company stock for proceeds of over $4 million.

- As fully described above, during the Relevant Period, defendant Barretto sold 579,441 shares of Company stock for proceeds of almost $17.5 million.

- As fully described above, during the Relevant Period, defendant Rankin sold 696,210 shares of Company stock for proceeds of over $44 million.

- As fully described above, during the Relevant Period, defendant Collins sold 5,000 shares of Company stock for proceeds of $650,000.

- As fully described above, during the Relevant Period, defendant Stanley sold 900 shares of Company stock for proceeds of $59,229.

- As fully described above, during the Relevant Period, defendant Walker sold 65,320 shares of Company stock for proceeds of over $5 million.

119. While many of the Company's stockholders lost significant money with the shares dropping substantially, many of the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders.

120. As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Sprout Social stock and stock options they held.

**THE TRUTH IS FULLY REVEALED**

121. On May 2, 2024, after the close of market, Sprout Social issued a press release announcing its first quarter 2024 financial results. The May 2024 Press Release revealed that the Company had missed its revenue guidance for the quarter and that it was issuing a revised decreased revenue guidance for the Company's full-year 2024 by $20 million.

122. In relevant part, the May 2024 Press Release quoted defendant Del Preto as saying that "[w]e underestimated the magnitude of enterprise seasonality that now comes with our

business mix, while also self-inducing sales execution headwinds during Q1 that we believe were important to position us for future success."

123.     Regarding the Company's revised financial outlook for its full-year 2024, the May 2024 Press Release stated as follows:

> For the full year 2024, the Company currently expects:
>
> - Total revenue lowered to be between $405.0 million and $406.0 million. This assumes >20% organic Sprout revenue growth and accelerated Tagger subscription revenue growth.
>
> - Non-GAAP operating income between $28.0 million and $29.0 million, including an estimated benefit from the deferred commission accounting change which will affect all future periods. Excluding this change, the Company expects Non-GAAP operating income between $15.0 million and $16.0 million.
>
> - This implies year-over-year Non-GAAP operating margin improvement of roughly 560bps. Excluding the accounting change this implies year-over-year non-GAAP operating margin improvement of roughly 240bps.
>
> - Non-GAAP net income per share between $0.45 and $0.46 based on approximately 57.0 million weighted-average shares of common stock outstanding.

124.     The same day, Sprout Social held an earnings conference call during which defendant Barretto revealed that the Company "made several important strategic decisions heading into Q1, such as building new vertical sales teams, accelerating promotions in our midmarket and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams." Barretto continued on to disclose that Defendants "thought we could manage these changes without disruption, but they collectively set us back" and that "the decisions on all of this happened in Q4 [2023] and the execution of it happened in Q1." Defendant Barretto also added that contributing to the poor results was the "intro[duction of] some new teams and changing some of the account coverage and taking the team off the floor for enablement[,]" as well as a "focus [] in Q4 with execution versus building pipeline for Q1."

125.    Defendant Barretto also commented on the revenue sales cycle, stating, in relevant part:

> After a record back half of 2023, where the majority of our focus was deeply weighted on closing deals versus creating new pipeline, we walked into 2024 with a different business.  We're now enterprise-heavy and the linearity of our business has changed materially, which affects our revenue recognition and planning.
>
> Our months, quarters and years are now more heavily weighted to traditional enterprise buying cycles.  We underestimated the magnitude of this shift and the quickly changing dynamics in our customer mix.  On top of this, we made several important strategic decisions heading into Q1, such as building new vertical sales teams, accelerating promotions in our midmarket and enterprise teams, adjusting our account coverage model and prioritizing Tagger enablement for all of our customer-facing teams.

126.    In stark comparison to his previous statements regarding the Company's fast sales cycle, defendant Barretto stated during the call that "we are definitely seeing lengthening of our sales cycles as the composition of the customer base and the prospect base is changing."

127.    Defendant Howard disclosed that Sprout Social's first quarter 2024 "energy and calorie[s]" were spent on "tactical decisions," including "spending time with the team on Tagger enablement[.]"  Defendant Barretto added that "[f]rom a sales team perspective, the maturity of the sales team, we did a lot of enablement in Q1 across our entire customer-facing or to make sure that we are up to speed with all of the elements of influencer and our Taggerplatform."

128.    Following the May 2, 2024 disclosures, analysts were heavily critical, with, for example, Cantor Fitzgerald stating, "the execution issues [Sprout Social] is now facing, which are a result of its [go-to-market] strategy, should have been apparent much earlier than today." KeyBanc downgraded the Company, stating that, "[w]e are taking this one particularly hard because in a number of our recent launch conversations, we have mentioned SPT as a favorite small-cap growth name to own, but the facts have changed too much[.]"

129.    On this news, the Company's stock price fell $19.33 per share, or 40.1%, from a closing price of $48.15 on May 2, 2024, to close at $28.82 on May 3, 2024, on unusually heavy trading volume.

**AN INVESTOR FILES A SECURITIES CLASS ACTION**

130.    On May 13, 2024, a purported purchaser of Sprout Social stock filed a securities class action complaint, captioned *Munch v. Sprout Social Inc., et al.*, Case No. 1:24-cv-03867 in the United States District Court for the Northern District of Illinois against Sprout Social and defendants Howard, Barretto, and Del Preto (the "*Munch* Action"). The *Munch* Action alleges that throughout the class period of November 2, 2023 and May 2, 2024, the defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

131.    On July 2, 2024, another securities class action complaint was filed in the United States District Court for the Northern District of Illinois against Sprout Social and defendants Howard, Barretto, and Del Preto captioned *City of Hollywood Police Officers' Retirement System v. Sprout Social Inc., et al.*, Case No. 1:24-cv-05582 (the *"City of Hollywood* Action" and with the *Munch* Action, the "Securities Class Action"). The *City of Hollywood* Action extended the class period to between November 3, 2021 and May 2, 2024.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**
**DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO SPROUT SOCIAL**

132.    As a result of the Individual Defendants' improprieties, Sprout Social disseminated improper public statements concerning Sprout Social's operations, prospects, and internal controls. This misconduct has devastated Sprout Social's credibility.

133.     As a direct and proximate result of the Individual Defendants' actions, Sprout Social has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

134.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Sprout Social's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

135.     Lastly, the actions of the Individual Defendants have irreparably damaged Sprout Social's corporate image and goodwill.  For at least the foreseeable future, Sprout Social will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Sprout Social's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

136.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

137.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

138.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

139. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

140. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Sprout Social and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE
ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY
REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

141. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

142. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

143. Plaintiff is an owner of Sprout Social common stock and has been an owner of Sprout Social common stock since the wrongdoing alleged herein.

144.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

## DEMAND IS FUTILE

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

146.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Sprout Social Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

147.    At the time Plaintiff commenced this action, the Board consisted of the seven Director Defendants: Howard, Rankin, Barris, Collins, Moskowitz, Stanley, and Walker. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### Demand Is Futile Because the Director Defendants Each Face a Substantial Likelihood of Personal Liability

148.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Sprout Social's business, operations, prospects, internal controls, and financial statements.

149.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and/or reckless authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being

implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith.

150. The Director Defendants also solicited the 2022, 2023, and 2024 Proxy Statements asking its stockholders to vote, among other things, to reelect themselves to the Board in continued breach of their fiduciary duties.

151. The Director Defendants also approved the 2022, 2023, and 2024 Proxy Statements and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

152. If the Director Defendants were to bring a suit on behalf of Sprout Social to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

**The Audit Committee Defendants Face a Greater Likelihood of Personal Liability**

153. The Audit Committee Defendants (defendants Collins, Moskowitz, and Walker), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**The Insider Trading Defendants on the**
**Board Face a Greater Likelihood of Personal Liability**

154.    Because of their positions as officers and/or board members, each of the Insider

Trading Defendants (defendants Howard, Barretto, Del Preto, Rankin, Collins, Stanley, and

Walker) possessed material non-public information regarding *inter alia*, that: (i) the Company's

sales and revenue growth were not indicative of the Company's growth as it transitioned to an

enterprise sales cycle; (ii) the Company did not have the ability to sell to enterprise customers,

failing to execute its purported "unique go-to-market strategy" for those customers; (iii) as a result,

the Company overpaid for Tagger and faced integration challenges with the acquisition; (iv) as a

result, the Company was experiencing longer sales cycles and a slowing pipeline; (v) consequently,

the Company would revise fiscal year 2024 revenue guidance; and (vi) as a result, the Individual

Defendants' positive statements about the Company's business, operations, and prospects were

materially false, misleading, and lacked a reasonable basis.

155.    The Insider Trading Defendants unlawfully misused this information and unjustly

enriched themselves by selling their shares at artificially inflated prices. As a result, the Insider

Trading Defendants' conduct harmed Sprout Social as the Insider Trading Defendants unjustly

enriched themselves at the Company's expense. Accordingly, because this action asserts claims

for unjust enrichment against the Insider Trading Defendants, and because the Insider Trading

Defendants face a substantial likelihood of liability for these claims as well as for their breaches

of fiduciary duty to the Company, the Insider Trading Defendants are incapable of considering a

demand to commence and vigorously prosecute this action.

**Additional Demand Futility Allegations**

156.    Defendant Howard is not an independent director. Howard is not independent

because he co-founded the Company and has served as Sprout Social's CEO and Chair of the

Board since April 2010. As such, the 2024 Proxy Statement explicitly states that Howard is not independent. Defendant Howard received substantial compensation during the Relevant Period and continues to receive compensation as described above. These amounts are material to defendant Howard, and therefore, he would not be able to impartially consider a demand against the Board and the members of its Compensation Committee. Accordingly, for these reasons and those described above and below, demand is futile as to defendant Howard.

157. In addition, defendant Howard is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendant Howard's willful and/or reckless violations of his obligations as CEO and director of Sprout Social. Hence, defendant Howard is incapable of considering a demand to commence and vigorously prosecute this action because he faces an even greater likelihood of personal liability than the rest of the Individual Defendants.

158. Defendant Rankin is not an independent director. Defendant Rankin co-founded the Company and has served as a member of the Board since April 2010. From April 2010 to December 2023, Rankin served as Sprout Social's CTO. As such, the 2024 Proxy Statement explicitly states that Rankin is not independent. Defendant Rankin received substantial compensation during the Relevant Period and continues to receive compensation as described above. These amounts are material to defendant Rankin, and therefore, he would not be able to impartially consider a demand against the Board and the members of its Compensation Committee.

Accordingly, for these reasons and those described above and below, demand is futile as to defendant Rankin.

**FIRST CAUSE OF ACTION**
**Against the Individual Defendants for Breach of Fiduciary Duties**

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

160.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sprout Social's business and affairs.

161.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sprout Social.

163.    In breach of their fiduciary duties owed and owe to Sprout Social, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:  (i) the Company's sales and revenue growth were not indicative of the Company's growth as it transitioned to an enterprise sales cycle; (ii) the Company did not have the ability to sell to enterprise customers, failing to execute its purported "unique go-to-market strategy" for those customers; (iii) as a result, the Company overpaid for Tagger and faced integration challenges with the acquisition; (iv) as a result, the Company was experiencing longer sales cycles and a slowing pipeline; (v) consequently, the Company would revise fiscal year 2024 revenue guidance; and (vi)

as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

164.    Accordingly, Sprout Social's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

165.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby rendering themselves personally liable to the Company for breaching their fiduciary duties.

166.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

167.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

168.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

169. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

170. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sprout Social has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

171. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

172. The Individual Defendants are liable to the Company because they violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

173. The Individual Defendants did the following while acting individually and collectively:

(a) employed devises, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

62
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Sprout Social common stock during the Relevant Period.

174.    As set forth above, the Individual Defendants disseminated or approved the dissemination of materially false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

175.    The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

176.    As a result of the Individual Defendants' making these materially false and misleading statements or permitting them to be made, Sprout Social's common stock traded at artificially inflated prices during the Relevant Period.

177.    Accordingly, the Company has suffered damages because it paid artificially inflated prices for Sprout Social common stock.

### THIRD CAUSE OF ACTION
### Against the Securities Class Action Defendants
### for Contribution under Sections 10(b) and 21D of the Exchange Act

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

179.    Sprout Social along with the Securities Class Action Defendants (Howard, Barretto, and Del Preto) are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Sprout Social.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

180.    Because of their positions of control and authority as officers and/or directors of Sprout Social, the Securities Class Action Defendants was/were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sprout Social, including the wrongful acts complained of herein and in the Securities Class Action.

181.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

182.    As such, Sprout Social is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

**FOURTH CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

184.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

185.    The 2022, 2023 and 2024 Proxy Statements violated Section 14(a) and Rule 14a-9 because each solicited Sprout Social stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with, *inter alia,* its ability to sell to enterprise customers any lengthening sales cycle.

186.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and roles in the process and in the preparation of the 2022, 2023, and 2024 Proxy Statements, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2022, 2023, and 2024 Proxy Statements.

187.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2022, 2023, and 2024 Proxy Statements were materially false and misleading.

188.    The omissions and false and misleading statements in the 2022, 2023, and 2024 Proxy Statements are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2022, 2023, and 2024 Proxy Statements and in other information reasonably available to stockholders.

189.    As a direct and proximate result of the dissemination of the false and misleading 2022, 2023, and 2024 Proxy Statements that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Sprout Social suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for Unjust Enrichment**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

191.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sprout Social.

192.     The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Sprout Social that was tied to the performance or artificially inflated valuation of Sprout Social, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

193.     Plaintiff, as a stockholder and representative of Sprout Social, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

194.     Plaintiff, on behalf of Sprout Social, has no adequate remedy at law.

### SIXTH CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

195.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

198.    Plaintiff, on behalf of Sprout Social, has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION
### Against the Individual Defendants for Aiding and Abetting

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.    Each of the Individual Defendants acted and is acting with knowledge of, or with reckless disregard to, the fact that the other Individual Defendants are in breach of their fiduciary duties to Sprout Social and has participated in a conspiracy in breach of fiduciary duties.

201.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

202.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

203.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

Case: 1:24-cv-08008 Document #: 1 Filed: 09/03/24 Page 69 of 72 PageID #:69

204.     Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

205.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

### EIGHTH CAUSE OF ACTION
### Against the Insider Trading Defendants for
### Insider Selling and Misappropriation of Information

206.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.     At the time of their stock sales set forth herein, the Insider Trading Defendants (Howard, Barretto, Del Preto, Rankin, Collins, Stanley, and Walker) knew of the information described above and sold Sprout Social common stock on the basis of such information.

208.     The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Sprout Social common stock.

209.     The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

210.     Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

68
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Sprout Social and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Sprout Social common stock while in possession of insider information as described herein;

D.      Awarding prejudgment interest to the Company;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Dated:  September 3, 2024

Respectfully submitted,

/s/ Anthony F. Fata

Anthony F. Fata
Sarah E. Flohr
Cormac H. Broeg
KIRBY McINERNEY LLP
211 West Wacker Drive, Suite 550
Chicago, Illinois 60606
Tel:  (312) 767-5180
Fax:  (312) 767-5181
afata@kmllp.com
sflohr@kmllp.com
cbroeg@kmllp.com

Attorneys for Plaintiff Stephen Hannaway

OF COUNSEL:

Melissa A. Fortunato
(pro hac vice to be submitted)
Marion C. Passmore
(pro hac vice to be submitted)
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, New York 10019
Tel:  (212) 308-5858
Fax:  (212) 214-0506
fortunato@bespc.com
passmore@bespc.com

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Stephen Hannaway, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Sprout Social, Inc., and authorize its filing.  I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true.  I further declare that I am a current holder of Sprout Social, Inc. stock and have continuously held Sprout Social Inc. stock from the time of the wrongdoing alleged herein until the present.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this __28__ day of August 2024.

*Stephen Hannaway*
Stephen Hannaway (Aug 28, 2024 11:58 CDT)

Stephen Hannaway